IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 14, 2005 Session

## CONNIE J. NORRIS v. EAST TENNESSEE CHILDREN'S HOSPITAL, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-562-98      Harold Wimberly, Judge**

———————————

**No. E2004-02501-COA-R3-CV  - FILED OCTOBER 31, 2005**

———————————

This is a medical malpractice case arising out of the postoperative treatment and care of Emit Greg Norris ("the child"), the minor child of Connie J. Norris ("the plaintiff"). At the conclusion of the plaintiff's case-in-chief, the remaining defendants moved for a directed verdict. The trial court determined that the plaintiff had failed to present a prima facie case of acts or omissions of medical negligence that proximately caused the condition that resulted in the child's death. Accordingly, the trial court granted the defendants' motion and dismissed the plaintiff's case. The plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

J. Mikel Dixon, Knoxville, Tennessee, for the appellant, Connie J. Norris.

Bruce A. Anderson, Knoxville, Tennessee, for the appellee, East Tennessee Children's Hospital.

Robert H. Watson, Jr. and Nathan D. Rowell, Knoxville, Tennessee, for the appellees, Robert R. Madigan, M.D., and Cameron J. Sears, M.D.

James H. London and Margaret G. Klein, Knoxville, Tennessee, for the appellee, Howard C. Filston, M.D.

Dixie W. Cooper and Amy D. Hampton, Nashville, Tennessee, for the appellee, Donald H. Nguyen, M.D.

**OPINION**

I.

Prior to the matters at issue in this case, the child suffered from spinal curvature, a congenital condition that first manifested itself when he was 11-years-old. On Wednesday, September 3, 1997, the child, who was then 14-years-old, underwent a complicated, but recommended, surgical procedure on his spine at East Tennessee Children's Hospital ("ETCH") in Knoxville. The surgery involved the installation of metal rods in the child's spine; it carried a known risk of paralysis. The attending orthopedic surgeons, Dr. Robert R. Madigan and Dr. Cameron J. Sears, performed the procedure with the assistance of Dr. Alan Anderson, a pediatric surgeon, and Dr. Matthew Mancini, the attending medical resident. During the course of the surgery, it became apparent that paralysis was setting in. Because of this, the child's neurosurgeon, Dr. Louis W. Harris, Jr., made a decision to abort the surgery. Dr. Harris performed alternative surgical treatment and bone grafting to stabilize the child's spine.

Following the aborted procedure, the child was transferred to the pediatric intensive care unit ("the PICU") of ETCH where he remained until he was transferred to a hospital room on Friday, September 5, 1997. During his stay in the PICU, the paralysis went away; however, the child continued to suffer from surgery-related soreness. He was given two medications, Prednisone, a steroid, and Toradol, an anti-inflammatory. Both medications are ulceragenic, *i.e.*, medicines that have the potential to cause ulcers.

On that Friday morning, the child appeared to be progressing well. However, during the day, he complained of stomach pain and presented a urinary dysfunction. Dr. Madigan, Dr. Donald H. Nguyen, a pediatric urologist, Dr. Howard C. Filston, a pediatric surgeon covering for Dr. Anderson, and numerous nurses employed by ETCH attended to the child during this period.

On the morning of Saturday, September 6, 1997, the child's condition worsened. Around 8:00 a.m., Dr. Mancini ordered that the child be transferred back to the PICU. En route, the child suffered full cardiopulmonary arrest. The determined cause of the cardiac arrest was a perforated ulcer with extensive soilage that led to respiratory compromise. Dr. Filston performed an eight-hour surgery to repair the perforated ulcer; but, ultimately, the child suffered irreversible brain damage. He was taken off life support on September 10, 1997. He died the same day.

On September 9, 1998, the plaintiff filed suit against various defendants alleging negligence in the post-surgical treatment and care of the child. The plaintiff alleged that the defendants' negligence began on Friday, September 5, 1997, after the child complained of stomach pain and presented a low urine output. The plaintiff asserted that the defendants' failure to properly investigate the cause of the child's symptoms fell below the general postoperative standard of care and proximately caused his death. The plaintiff does not allege a deviation in the standard of care surrounding the aborted spinal surgery and the immediate aftermath of recovery following that surgery, including the prescription of the two ulceragenic medications. Each defendant claims that

his care of the child was within the recognized standard of care. They deny that any act or omission on their part was the proximate cause of the child's death.

On November 25, 2003, the plaintiff filed her third amended complaint. In that pleading, the plaintiff named as defendants, ETCH, Dr. Madigan, Dr. Sears, Dr. Filston, and Dr. Nguyen. On March 5, 2004, the trial court granted Dr. Nguyen's motion to dismiss, holding that the third amended complaint against him was barred by the earlier entry in this same litigation of summary judgment in Dr. Nguyen's favor. Later, the trial court denied ETCH's motion to dismiss, which motion was based upon the three-year statute of repose.

The plaintiff's case proceeded to trial against Dr. Madigan, Dr. Sears, Dr. Filston, and ETCH. After two days of testimony, the plaintiff rested, after which the defendants moved for a directed verdict. The trial court granted the defendants' motion and dismissed the plaintiff's case. In reaching its decision, the trial court ruled that the plaintiff's sole expert medical witness failed to establish that any act or omission on the part of the defendants proximately caused the condition that led to the child's death. From this judgment, the plaintiff appeals.

II.

The plaintiff raises the following issues for our review:

1. Did the trial court err in granting Dr. Nguyen's motion to dismiss?

2. Did the trial court err in granting the defendants' motion for a directed verdict and in determining that the plaintiff failed to make out a prima facie case that the defendants were guilty of medical malpractice that proximately caused the child's condition and resulting death?

ETCH raises a separate issue. It contends that the trial court erred in denying its motion to dismiss based upon the three-year statute of repose.

III.

A.

The plaintiff asks us to determine whether the trial court erred in granting Dr. Nguyen's motion to dismiss, which motion was predicated upon the doctrine of *res judicata*. The trial court granted Dr. Nguyen's motion, holding that the suit against him was barred by an earlier grant of summary judgment to him. The earlier order had been entered pursuant to Tenn. R. Civ. P. 54.02. It was not appealed from and, with the passage of time, became final.

The doctrine of *res judicata* bars subsequent suits between the same parties on the same

cause of action regarding all issues that were previously litigated or could have been litigated. *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987); *A.L. Kornman Co., v. Metro Gov't of Nashville and Davidson County*, 391 S.W.2d 633, 636 (Tenn. 1965); *Gregory v. Gregory*, 803 S.W.2d 242, 244 (Tenn. Ct. App. 1990). In order to prevail on the defense of *res judicata*, a party must show: (1) a previous judgment was rendered by a court of competent jurisdiction; (2) the previous suit involved the same parties; (3) the previous suit involved the same cause of action; and (4) the previous judgment was rendered on the merits. *Lee v. Hall*, 790 S.W.2d 293, 294 (Tenn. Ct. App. 1990) (citing *Hutcheson v. TVA*, 604 F.Supp. 543, 550 (M.D. Tenn. 1985)). A summary judgment entered pursuant to the provisions of Tenn. R. Civ. P. 54.02 is generally held to be an adjudication on the merits for the purpose of *res judicata*. *See Harrgate Corp. v. Systems Sales Corp.,* 915 S.W.2d 812, 816 (Tenn. Ct. App. 1995) (acknowledging that "the granting of summary judgment is deemed conclusive of all issues reached and decided by such summary judgment") (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)).

Rule 54.02 states, in pertinent part, that:

> [w]hen more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the Court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay an upon an express direction for the entry of judgment . . . .

Our consideration of the trial court's decision to grant Dr. Nguyen's motion to dismiss requires us to review Dr. Nguyen's procedural involvement in this particular litigation.

Dr. Nguyen was originally brought into this litigation when he was named as a defendant in the plaintiff's earlier amended complaint filed July 24, 2000. In response to that pleading, Dr. Nguyen moved for summary judgment. That motion was granted by an order entered December 3, 2001. As previously stated, the order was entered pursuant to the provisions of Tenn. R. Civ. P. 54.02. The order recites that it "represents an adjudication on the merits, and upon entry, shall be binding on all parties as to the liability of Dr. Nguyen, which liability shall not be submitted to the fact finder for consideration under the doctrine of comparative fault." The order also provides that it is "final in favor of [Dr. Nguyen]." As noted earlier, the plaintiff did not file a notice of appeal as to the Rule 54.02 summary judgment in favor of Dr. Nguyen.

Almost two years later, on November 13, 2003, ETCH filed an answer to the complaint against it in which it identified Dr. Nguyen as one to whom fault should be assigned pertaining to the plaintiff's claim against ETCH. On November 25, 2003, the plaintiff filed its third amended complaint, bringing Dr. Nguyen back into the litigation.

The plaintiff argues that the earlier grant of summary judgment to Dr. Nguyen is not a bar to the renaming of Dr. Nguyen as a defendant in this case. She points to the fact that ETCH was not

a party to the case when Dr. Nguyen filed his motion for summary judgment on July 20, 2001.[1]  This argument is not well taken.  All of the elements of a *res judicata* defense are present in this case – the trial court had jurisdiction over the plaintiff's earlier allegations against Dr. Nguyen; the plaintiff's third amended complaint against Dr. Nguyen involves the same parties and the same cause of action; and the previous summary judgment was on the merits.  *See Lee*, 790 S.W.2d at 294.  By renaming Dr. Nguyen as a defendant in this case, even though it was in response to another defendant's allegation of the doctor's comparative fault, the plaintiff attempts to allocate fault and seeks a judgment against Dr. Nguyen regarding his alleged medical negligence in the treatment of the child.  The claim attempted to be asserted against Dr. Nguyen in the third amended complaint filed in 2003 is identical to the claim adjudicated in Dr. Nguyen's favor in the 2001 order.  No one appealed that order and it became final and is still final.  *Res judicata* is a complete bar to the plaintiff's 2003 effort to litigate Dr. Nguyen's alleged actionable negligence in this case.

As an alternative basis for the trial court's decision to grant Dr. Nguyen's motion to dismiss, the said defendant relies upon the three-year statute of repose applicable to medical malpractice suits.  *See* Tenn. Code Ann. § 29-26-116(a)(3) (2000).  We do not find it necessary to reach this alternative ground.  A final judgment is a final judgment.  In the absence of a Tenn. R. Civ. P. 60 basis for relief – and that rule is not involved in the instant case – that final judgment serves to insulate the parties to it from further litigation on the subject.  There is nothing more that needs to be said to justify the grant of Dr. Nguyen's motion to dismiss.

B.

ETCH argues that the trial court erred in denying its motion to dismiss, which motion was predicated on the three-year medical malpractice statute of repose.

Tenn. Code Ann. § 29-26-116(a)(3) provides that "[i]n no event shall [a medical malpractice claim] be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment . . . ."  *Id.*  The plaintiff argues that Tenn. Code Ann. § 20-1-119 (Supp. 2005), permits her to rename ETCH as a defendant outside the three-year statute of repose because ETCH was originally sued within the period of the statute of limitations.  We do not agree with this argument.

Tenn. Code Ann. § 20-1-119 provides, in relevant part, as follows:

> (a) In civil actions where comparative fault is or becomes an issue, if a defendant named in an original complaint initiating a suit filed within the applicable statute of limitations, or named in an amended complaint filed within the applicable statute of limitations, alleges in an answer or amended answer to the original or amended complaint that a person not a party to the suit caused or contributed to the injury

---

[1] ETCH was renamed as a defendant in the second amended complaint filed September 27, 2001.

or damage for which the plaintiff seeks recovery, and if the plaintiff's cause or causes of action against such person would be barred by any applicable statute of limitations but for the operation of this section, the plaintiff may [amend the complaint or institute a separate action], within ninety (90) days of the filing of the first answer or first amended answer alleging such person's fault . . . .

\*   \*   \*

(b) A cause of action brought within ninety (90) days pursuant to subsection (a) shall not be barred by any statute of limitations. The section shall not extend any applicable statute of repose, nor shall this section permit the plaintiff to maintain an action against a person when such an action is barred by an applicable statute of repose.

*Id*. In order to utilize the above-referenced 90-day "window," a plaintiff must establish two conditions: (1) the defendant, who named the alleged fault tortfeasor, must have been sued within the applicable statute of limitations; and (2) the named tortfeasor must not be a current party to the suit. *Id.*; *McCullough v. Johnson City Emergency Physicians*, 106 S.W.3d 36, 46 (Tenn. Ct. App. 2002); *Townes v. Sunbeam Oster Co.*, 50 S.W.3d 446, 452-53 (Tenn. Ct. App. 2001).

In *McCullough v. Johnson City Emergency Physicians*, this court dealt with the interplay between Tenn. Code Ann. §§ 20-1-119 and 29-26-116(a)(3). *McCullough* involved a medical malpractice suit against various healthcare providers stemming from allegations of negligence in 1997. *McCullough*, 106 S.W.3d at 38. The plaintiff's original 1998 complaint did not name Cardiology Consultants as a defendant. *Id.* at 40. In 2000, but still within three years of the date of injury, the plaintiff amended his complaint to add Cardiology. *Id.* In 2001, four years after the alleged acts of malpractice, the trial court granted Cardiology's motion for summary judgment. *Id.* at 40. Less than two weeks after Cardiology's dismissal, and within ninety days of its being named as an alleged tortfeasor by another defendant, the plaintiff moved to amend his complaint to rename Cardiology as a defendant. *Id.* at 40-41. The trial court denied the plaintiff's motion to amend, and this court affirmed that denial. *Id.* at 41-48. Though we acknowledged that the plaintiff met the two conditions required to use the 90-day period provided for under Tenn. Code Ann. § 20-1-119, this court specifically held that Tenn. Code Ann. § 20-1-119 does not toll the medical malpractice statute of repose provided by Tenn. Code Ann. § 29-26-116(a)(3). *McCullough*, 106 S.W.3d at 46.

In the action currently before this Court, the plaintiff originally filed suit against ETCH on September 8, 1998, shortly before the expiration of one year after the death of the child. The plaintiff voluntarily nonsuited ETCH on September 24, 1999. The plaintiff *did not* rename ETCH as a defendant within the one-year savings statute found at Tenn. Code Ann. § 28-1-105 (2000). As a result of subsequent discovery by the parties, two of the remaining defendants amended their answer to name ETCH as an alleged comparative tortfeasor. On September 27, 2001, more than four

years from the date of the child's death, the plaintiff filed her second amended complaint again adding ETCH as a defendant.

The plaintiff argues that *McCullough*, and specifically footnote 5 to that opinion, stands for the proposition that "[a] defendant who has been originally sued within the applicable statute of repose may be brought back into the case notwithstanding that the statute of repose has expired at the time the originally sued defendant is rejoined." The plaintiff's interpretation of the *McCullough* footnote is incorrect. The referenced footnote pertains to a situation in which a plaintiff, following a voluntary nonsuit of a defendant, invokes the one-year savings statute under Tenn. Code Ann. § 28-1-105.[2] The plaintiff in the instant case did not choose to bring ETCH back into the litigation within a year of the nonsuit. Thus, Tenn. Code Ann. § 28-1-105 and the *McCullough* footnote do not apply. Our holding in *McCullough* is controlling – the three-year medical malpractice statute of repose barred the plaintiff's renaming of ETCH as defendant in 2001. The trial court erred in denying ETCH's motion to dismiss, and consequently, ETCH was not a proper party at trial.[3]

C.

The plaintiff argues that the trial court erred in granting the remaining defendants' motion for a directed verdict; she accuses the trial court of faulty reasoning in determining that the expert testimony offered by the plaintiff did not establish a prima facie case of medical malpractice against any of the remaining defendants. We review the trial court's grant of a directed verdict under the following well-established standard:

> [i]n ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Sauls v. Evans*, 635 S.W.2d 377 (Tenn. 1982); *Holmes v. Wilson*, 551 S.W.2d 682 (Tenn.

---

[2]The *McCullough* footnote states as follows:

> Our Supreme Court has held: "a plaintiff who initially files a medical malpractice action within the one-year statute of limitations and the three-year statute of repose can rely upon the savings statute and refile the action within one year of the voluntary dismissal, even though the voluntary dismissal and refiling occur beyond the three-year medical malpractice statute of repose."

*McCullough*, 106 S.W.3d at 47 n.5 (citations omitted).

[3]Because we have determined that ETCH should have been dismissed as a defendant prior to trial, we will not discuss that defendant when we address the trial court's grant of a directed verdict.

1977). If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. *Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn. 1980).

*Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994).

Our analysis of the trial court's grant of a directed verdict begins with an examination of the strict and technical proof requirements of the Tennessee medical malpractice statutes.

The plaintiff in a medical malpractice action has the burden of proving the following three elements by way of expert testimony:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a)(1-3) (Supp. 2005); *see Kilpatrick v. Bryant*, 868 S.W.2d 594, 597-98 (Tenn. 1993); *see also Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990) (stating that the three basic elements of a plaintiff's medical malpractice claim—the standard of care, the deviation of the standard, and proximate cause—must be proven by competent expert testimony). The plaintiff must offer expert testimony setting forth specific facts demonstrating that a defendant's acts or omissions fell below the recognized standard of care and that those acts or omissions proximately caused the subject injury. *See, e.g., Payne,* 796 S.W.2d at 143. In specifically addressing the proximate cause prong, which is especially important in the case at bar, the Supreme Court has stated that

> [t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; *and when the matter remains one of pure speculation or conjecture* or the probabilities are at best evenly balanced*, it becomes the duty of the court to direct a verdict for the defendant . . . .*

*Kilpatrick*, 868 S.W.2d at 602 (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985) (emphasis added); *see also* *Dolan v. Cunningham*, 648 S.W.2d 652, 654 (Tenn. Ct. App. 1982) (recognizing that the plaintiff's expert must testify that the injury "would not otherwise have occurred" without the defendant's negligent act or omission). If a plaintiff fails to establish any one of the three required elements, his or her medical malpractice claim is subject to dismissal.

The plaintiff presented the testimony of a single medical expert, Dr. Martin T. Evans, a vascular and general surgeon. Thus, the plaintiff's case rises or falls on Dr. Evans' testimony.

The plaintiff's overarching criticism of the defendants' medical treatment was their alleged failure to properly and completely investigate the cause of the child's stomach pain and urinary dysfunction. Dr. Evans acknowledged that the treatment rendered to the child on September 3rd and 4th did not fall below the recognized standard of care. Furthermore, Dr. Evans stated that it was too late to help the child when Dr. Mancini attempted to transfer him back to the PICU around eight o'clock on the morning of September 6th. It follows that Friday, September 5, 1997, is the critical day; if there was negligent treatment that proximately caused the child's adverse condition and resulting death, it occurred on that date. We will now explore the plaintiff's case against Dr. Filston, Dr. Sears, and Dr. Madigan. A thorough review of the record indicates that the plaintiff's criticisms principally revolve around the treatment of the child beginning on Friday afternoon through the early hours of Saturday.

## Dr. Filston

Around 7:30 p.m. on the evening of the 5th, Dr. Filston, the pediatric surgeon covering for Dr. Anderson, visited the child for the first time. Dr. Filston was asked to see the child for the limited purpose of managing his chest tube. Dr. Filston found the child alert and comfortable, but noted his difficulty in urinating. He saw Dr. Nguyen's consultation note. Later that evening, Dr. Filston again visited the child. In response to the child's continued stomach pain, Dr. Filston ordered an abdominal x-ray and later returned to review it. The film showed a nonspecific gas pattern with no apparent evidence of bowel obstruction or free air, which would necessitate surgical intervention.[4] Believing that the child was experiencing normal postoperative bowel cramping and retention, Dr. Filston ordered a suppository to assist in eliminating bowel gas. Dr. Filston left the hospital late Friday night and returned on Saturday morning after the child's catastrophic event.

Dr. Evans testified that Dr. Filston deviated from the general postoperative standard of care by "put[ting] blinders on and look[ing] only at the chest tube . . . [,and] when there were complaints voiced about abdominal distension and issues related to [urinary dysfunction], he began a workup that he did not complete." It is undisputed that the plaintiff can only hold Dr. Filston liable for not intervening or investigating *after* he arrived at the hospital around 7:30 p.m. on Friday. Thus, to establish that Dr. Filston's actions or inactions proximately caused the child's adverse condition and

---

[4]The plaintiff asserts that Dr. Filston misread the x-ray, but Dr. Evans' testified that "[he] could not [himself] determine whether there was or was not free air."

resulting death, the plaintiff must present evidence that diagnosis or surgical intervention by Dr. Filston sometime after he arrived Friday *evening* would have changed the child's outcome. The plaintiff never presented such proof. The only testimony given by Dr. Evans regarding the proximate cause of the child's injury is as follows:

> Q: Now, with respect to those deviations in the standard of care, what difference would it make if those deviations from the standard of care had not occurred for this patient, Dr. Evans, in your opinion?
>
>              *    *    *
>
> A: It's my strong opinion that had attention been directed towards the attending team and/or any other member of the medical team the fact that a rising pulse rate, decrease in urinary output, and/or changes in blood pressure, had those facts been revealed to the attending team and had they properly investigated the –these facts *as early as noon on [Friday, September 5, 1997]*, that a reasonable conclusion and definitive treatment would likely be rendered.
>
> In view of that, it's my strong opinion that a successful outcome could have been achieved had those facts been revealed, studied, and acted upon, which is not the case here.
>
> Q: Is it more likely than not; that is, more probable that a successful outcome would have been achieved in this patient based on what you have seen of the entire record?
>
>              *    *    *
>
> A: In fact, the patient did undergo an operation by Dr. Filston, did come through the operation, but was severely brain damaged because of the failure to act earlier. He did–was able to survive the operation, he was able to get through that, a proper operation was conducted, albeit late, and as a result it is my strong opinion that had that operation been conducted earlier, based on abnormal vital signs, based on abnormal x-rays, based on an investigation by the appropriate parties, that that *diagnosis could have been made by midday on [Friday]*, and as a result, a successful outcome more likely than not would have occurred.

(Emphasis added).

On cross-examination, Dr. Evans was asked to clarify his earlier statement:

Q: [Y]ou testified and I wrote this down, that Dr. Filston's surgery was not timely, it would have made a difference if it had been done *midday [on Friday]*.

So what you've testified, *it would have made a difference if they had done it around noon or so on Friday*, is that correct?

A: Yes.

(Emphasis added).

Dr. Evans testified that diagnosis or surgical intervention by noon, or midday, on Friday, September 5, 1997, would have led to a successful outcome for the child; however, he *never* stated whether a successful outcome was probable if diagnosis or surgery was performed anytime *past* noon, or midday, on Friday. The problem with this missing statement is emphasized by the following question posed by the trial court to the plaintiff's counsel:

The Court: How could [Dr. Filston] have made a diagnosis midday if he wasn't there until seven o'clock?

A: Well, he could have made the diagnosis at seven or eight o'clock that night, your Honor.

The Court: Where does this Dr. Evans say that that would have come up with a different result?

A: Well—

The answer to the trial court's question is that Dr. Evans never stated whether a later diagnosis, one that implicates the actions or inactions of Dr. Filston, would have changed the outcome. The plaintiff argues an inference can be drawn from Dr. Evans' entire testimony that diagnosis or surgical intervention could have saved the child's life *anytime* after noon on Friday and before Dr. Mancini arrived on the scene early Saturday morning. We do not agree that such an inference can be drawn. The testimony of Dr. Evans does not establish, directly or inferentially, that any action by Dr. Filston at 8:00 p.m. on Friday, or anytime after his arrival, could have changed the child's outcome. Without proof, *i.e.*, expert testimony, that some act past noon or midday on Friday could have saved the child, the acts or omissions of Dr. Filston are simply not actionable. The plaintiff had the burden of proving her case, and the plaintiff's proof with regard to proximate causation is lacking.

Dr. Sears and Madigan

-11-

Dr. Sears operated on and cared for the child on September 3rd and 4th. Dr. Sears did not treat the child on Friday, the critical day; but he was present on Saturday morning when the child went into cardiac arrest. Because Dr. Sears was not present at the hospital on September 5th, and because the plaintiff's expert testimony does not identify any medical negligence on September 3rd or 4th, we hold that Dr. Evans' expert testimony is insufficient to establish that any act or omission by Dr. Sears was the proximate cause of the child's adverse condition and resulting death.

Dr. Madigan did see the child on the morning of Friday, September 5th, but the record is unclear as to exactly what time this visit occurred.[5] During his morning visit, Dr. Madigan noted the child's urinary problem. In an attempt to determine the cause of the problem, Dr. Madigan requested a consultation from Dr. Nguyen. Noting that the child was doing well other than the stomach pain and urinary problem, Dr. Madigan transferred him from the PICU to the hospital floor. Dr. Madigan did not see the child again on Friday. Dr. Evans testified that he did not expect Dr. Madigan to diagnose the perforated ulcer based on his Friday morning exam. He also stated that Dr. Madigan's consultation request directed to Dr. Nguyen, the urologist, was appropriate. Dr. Evans does criticize Dr. Madigan for "violat[ing] the standard of care in the overall management of this patient." He stated that Dr. Madigan violated the standard of care by failing to diligently investigate the source of the child's noted urinary and abdominal problems. When asked to identify the facts that should have put Dr. Madigan on notice of the child's distress at the time of the doctor's visit to the hospital, Dr. Evans pointed to a steady rise in the child's pulse rate between 10:00 a.m. and 4:00 p.m.

The problem with this testimony is that it assumes, with no facts to support it, that Dr. Madigan was at the hospital when the pulse rate was rising. The hospital records do not establish this. On the contrary, Dr. Madigan noted in the child's chart *that his vital signs were stable.* There are simply no facts to support a conclusion that anything Dr. Madigan did or did not do on Friday constitutes a deviation from the standard of care. If Dr. Madigan is to be charged with knowledge of a rising pulse rate there must be evidence that the pulse rate was rising at the time of his visit. There is no such evidence.

IV.

The child's death was a tragedy, but the unfortunate outcome alone is not enough to hold the defendants responsible. The plaintiff must present its case—the standard of care, the deviation, and proximate causation. Here, the lack of expert testimony linking any negligence on the part of the defendants to the child's injury supports the trial court's granting of the defendants' motion for a directed verdict. The prima facie elements of a medical malpractice claim were not established.

V.

---

[5]Dr. Madigan made a notation on the child's chart regarding his visit on Friday. His entry on the chart is not timed. A subsequent notation on the chart was made by someone else at 1:50 p.m., indicating that Dr. Madigan's note was made at some time *before* 1:50 p.m. However, as acknowledged by Dr. Evans, Dr. Madigan's visit could have been minutes or even hours before the timed notation.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant, Connie J. Norris.  This case is remanded to the trial court for the collection of costs assessed there, pursuant to applicable law.


_____
CHARLES D. SUSANO, JR., JUDGE