# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 15, 2008 Session

## BARSHA BATES LAND ET AL. V. LARRY W. BARNES ET AL.

**Appeal from the Circuit Court for Lincoln County**
**No. C0300014     F. Lee Russell, Judge**

_____

**No. M2008-00191-COA-R3-CV - Filed September 10, 2008**

_____

The trial court dismissed this medical malpractice case after granting motions to exclude the testimony of both of the plaintiffs' expert witnesses. Based upon our conclusion that the trial court did not abuse its discretion in excluding the testimony of either expert witness, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Hugh Pierce Garner, Chattanooga, Tennessee, for the appellants, Barsha Bates Land, Monica Bates, and Samantha Talley.

William C. Rieder, Tullahoma, Tennessee, for the appellee, Larry W. Barnes; Robert M. Burns and Timothy P. Harlan, Nashville, Tennessee, and G. Michael Luhowiak, Chattanooga, Tennessee, for the appellee, Gail Shutt.

## OPINION

Charles A. Bates sought treatment at the Highland Rim Medical Health Care Center ("Highland Rim") in Fayetteville, Lincoln County, Tennessee on February 6, 1997. Dr. Larry Barnes, the physician at Highland Rim, was out of the office, and Mr. Bates was seen by Gail Shutt, a nurse practitioner. Mr. Bates reported a constant ache with occasional pain in his chest. His initial blood pressure was 220/100. Nurse Shutt ordered an EKG and chest x-ray, neither of which showed any acute problems. A second blood pressure reading was 198/98. Mr. Bates was given samples of two blood pressure medications, Ziac and Altace, which he was instructed to take as soon as he arrived home. According to Mr. Bates's daughter, Mr. Bates did take the medications soon after leaving the office. Nurse Schutt also instructed Mr. Bates to return to her office the following day for a recheck.

Later that day, Nurse Shutt received a telephone call from a member of Mr. Bates's family. Mr. Bates's condition had worsened. He exhibited slurred speech and apparent weakness on one side of his body. Nurse Shutt advised the family member that Mr. Bates had probably suffered a stroke and instructed them to take him to the emergency room immediately.

At Lincoln Regional Hospital, Mr. Bates was diagnosed with an intracranial hemorrhage. He was airlifted to Huntsville Hospital System in Huntsville, Alabama, where a neurologist diagnosed a brain hemorrhage secondary to hypertension. Mr. Bates progressed to brain death and was declared dead on February 7, 1997.

This wrongful death action was filed by the surviving children of Mr. Bates on January 29, 2003, against Dr. Barnes and Nurse Shutt. The complaint alleges that Nurse Shutt violated the applicable standard of care, thereby causing Mr. Bates's death. Dr. Barnes was sued on the basis of respondeat superior as Nurse Shutt's supervising physician. The plaintiffs asserted that Nurse Shutt violated the standard of care by failing to stabilize Mr. Bates's blood pressure before releasing him from Highland Rim, failing to administer appropriate blood pressure reduction therapy at Highland Rim, failing to contact a physician to see Mr. Bates, allowing Mr. Bates to leave Highland Rim with the complaints and symptoms he had, and failing to send Mr. Bates to the emergency room.

The trial of this case was set to begin on September 24, 2007. The defendants filed pre-trial motions in limine, which were heard on September 21, 2007. The trial court granted the defendants' motions to exclude the testimony of Dr. Sarah J. Polow and Gregory T. Stevens, a physician's assistant. As these were the plaintiffs' only two experts, the court dismissed the case.

**Standard of Review**

A trial court is vested with broad discretion in determining the "admissibility, qualifications, relevancy and competency of expert testimony." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997); *see also Robinson v. LeCorps*, 83 S.W.3d 718, 725 (Tenn. 2002). Thus, we review a trial court's decision regarding expert witness competency and qualifications under an abuse of discretion standard. *Robinson*, 83 S.W.3d at 725; *Taylor v. Jackson-Madison County Gen. Hosp. Dist.*, 231 S.W.3d 361, 371 (Tenn. Ct. App. 2006). There has been an abuse of discretion "when the trial court reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard." *Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005). The trial court's decision will be upheld "'so long as reasonable minds can disagree as to the propriety of the [trial court's] decision.'" *Id.* at 399 (quoting *State v. Scott*, 33 S.W.3d 746, 751 (Tenn. 2000)).

**Analysis**

The plaintiff's burden of proof in a medical malpractice action is set forth at Tenn. Code Ann. § 29-26-115(a), which provides:

2

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

The plaintiff must put on expert proof to establish the relevant standard of care, its breach, and causation. *Norris v. East Tennessee Children's Hosp.*, 195 S.W.3d 78, 86 (Tenn. Ct. App. 2005). With respect to the standard of care, subsection (a)(1) includes the "locality rule," which requires the plaintiff to prove the standard of acceptable practice in the community in which the defendant practiced or a "similar community."  Tenn. Code Ann. § 29-26-115(b) further provides:

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

<u>Testimony of Dr. Sarah J. Polow</u>

In excluding Dr. Polow's testimony, presented in the form of a deposition for proof, the trial court gave the following analysis:

[Dr. Polow is ] not asked and she does not tell us if she is familiar with the standard of care in Lincoln County and does not have sufficient familiarity with Lincoln County demonstrated to suggest that she's in a position to equate any other county with Lincoln County.  More importantly, she simply does not deal with the causation issue between the negligence and the death; she does between high blood pressure and stroke and stroke and death, I think that's clearly in there.  But as far as anything saying not only in these words but anything that is synonymous with these words, she simply does not say that there is a breach of the standard of care which has caused the death or has caused the stroke.

Thus, the trial court found that the plaintiffs failed to establish Dr. Polow's knowledge of the applicable standard of care under the locality rule and failed to address causation.

Dr. Polow testified that, since 1984, she had practiced family medicine and worked in the emergency room in Chatsworth, a town in Murray County, Georgia, and that she used nurse practitioners in her family medical practice.[1] She further gave fairly detailed testimony to indicate the similarities between Macon County, Georgia, and Lincoln County, Tennessee, and their medical communities:

> A.  Lincoln County in Tennessee is midway in the state, but along the southern border, between Tennessee and Alabama.  It is situated about 45 to 50 miles, I believe, west of Chattanooga, and we're [Murray County] about 45 to 50 miles southeast of Chattanooga.  So we share that radius of Chattanooga.  I know . . . Lincoln County [is] about 70 miles south of Nashville, and about 30 miles north of Huntsville.  County size, it's a little bit bigger than Murray County.  Population wise, they're both very similar.  I think, according to the 2000 census, we're both like in the mid 30s.  Murray County may be slightly bigger, at about 35-, 36,000, and Lincoln County about 31-, 32,000 people.  I think our demographics is [sic] very much the same, both about 97 percent white.  We both have some industrial base. And our hospitals are very similar, I think both around just under 50 beds.  We have similar full-time emergency rooms, full-time CAT scanners, O.R., acute care, O.R. being surgical suit – suites and MRI, and very similar laboratory and x-ray testing. I think physician-wise, actually, I think Fayetteville has a few more physicians, somewhere around 29 physicians, compared to Murray County's physicians, about 20, but we're still looking to recruit some more right now.
> Q.  Do you know how many hospitals that there are in each county?
> A.  I think just – just the one hospital.  We're one hospital here in Murray County; and Lincoln County, there's just the one, Lincoln Medical Center.
> Q.  And the beds, how do they compare with regard to size?
> A.  They're very similar.  Lincoln's just around 50.  Murray County's licensed for 42 beds.
> Q.  What is the nature of the practice of the physicians in Murray County and in Lincoln County?  Can you comment on that, Doctor[?]
> A.  Well, the majority of physicians are in primary care in both places.  Murray County has about five family practitioners, two internists, a rotating general surgery group, one – a rotating pediatric group, a rotating x – radiology, one urologist.  And I believe the make-up of the physicians in Fayetteville and Lincoln County are very similar.

Based upon this testimony, we disagree with the trial court's conclusion that Dr. Polow failed to provide a sufficient factual basis for her belief that Murray County, Georgia, was a similar community to Lincoln County, Tennessee.

---

[1]Although Dr. Polow also testified that she acted as a preceptor for several nurse practitioner programs, she did not begin this role until 2002.

However, Tenn. Code Ann. § 29-26-115(a) also requires that the expert be familiar with "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community." Tenn. Code Ann. § 29-26-115(b) likewise provides, in part, that the expert must have been licensed to practice "a profession or specialty which would make the person's expert testimony relevant to the issues in the case." The latter provision does not require that the expert practice the same profession or specialty as the defendant, "so long as the expert had a sufficient basis on which to establish familiarity with the defendant's field of practice and the standard of care required in dealing with the medical care at issue." *Bravo v. Sumner Regional Health Systs., Inc.*, 148 S.W.3d 357, 367 (Tenn. Ct. App. 2003). Although she testified that she had practiced family medicine in Murray County since 1984 and had used nurse practitioners "on and off" since 1986, Dr. Polow never expressly testified that she was familiar with the standard of care for nurse practitioners in Murray County.

Even if we assume, based upon her experience and her testimony concerning the standard of care for the treatment of patients with hypertension, that Dr. Polow was in fact familiar with the standard of care for nurse practitioners in Murray County, Georgia, her testimony on cross-examination casts doubt on whether that knowledge would be relevant to the standard of care applicable to a nurse practitioner in Lincoln County, Tennessee:

Q. And you know, just from general knowledge, that those regulations [governing nurse practitioners and other health care providers] must differ from state to state; is that correct?
A. Yes, that's correct.
Q. And I think you testified, too, in your deposition that you have not specifically looked at the Tennessee regulations as they apply to either PA's or nurse practitioners; is that correct?
A. That is correct.
Q. And I believe you also said that you knew or you thought you knew that Tennessee nurse practitioners can write certain prescriptions, but you weren't exactly sure how or if those prescriptive privileges are limited in any way. Do you recall that?
A. Yes.
Q. And I think you also said, in talking about what Tennessee nurse practitioners can or cannot do, beyond prescriptive privilege, you really didn't have an understanding of what the scope of their permissible practice was; is that correct?
A. Yes. That is specific to the State of Tennessee.
Q. Right.
A. That's right.
Q. I think you testified, as well, that you do not know if Tennessee recognizes any subcertifications or particular specializations for nurse practitioners. Do you recall that?
A. Yes, that's right, I don't, and I – right.
                          .   .   .

5

Q. We also talked a little bit about practice parameters or protocols. Do you recall that discussion?

A. Yes.

Q. And I think that you said that in Georgia you now – or the state of Georgia now has a system where, in a medical practice that employs a nurse practitioner, you can actually rely on a textbook, as opposed to a specific set of published parameters that go with that practice, correct?

A. That is correct.

Q. And when talking about the protocols and what was required in Tennessee, I believe you also testified that you did not know if Tennessee allowed a textbook-based protocol, or if it was still the more traditional system of having a specific dedicated set of protocols to that practice; is that correct?

A. That is correct.

Q. . . . [I]n Georgia, in fact, here in Chatsworth, is it correct that there's at least one nurse practitioner who practices, more or less, on her own?

A. There are actually two right now . . . in Chatsworth.

.   .   .

Q. I think you told me that as that situation [nurse practitioners practicing in their own offices] may apply in Tennessee, you did not know if Tennessee law or Tennessee regulations for nursing allowed nurse practitioners to so function; is that correct?

A. That is correct.

Q. There was some discussion, as well, about the supervisory role of physicians and how they may supervise nurse practitioners, and, certainly, you're familiar with that, as how it applies in the state of Georgia since you practice here, correct?

A. Yes.

Q. But I think you – and you said that you're not sure if it differs from state to state, and you're not sure if the same thing that applies here would apply in Tennessee; is that correct?

A. Yes.

Dr. Polow later testified that she had reviewed Highland Rim's protocol regarding hypertensive patients and believed that it conformed with the standard of care. This court has previously declined to equate internal manuals or protocols with the applicable standard of care. *Prewitt v. Semmes-Murphey Clinic, P.C.*, No. W2006-00556-COA-R3-CV, 2007 WL 879565, *16 (Tenn. Ct. App. Mar. 23, 2007) (perm. app. denied Aug. 20, 2007). Nevertheless, the trial court may have found that Dr. Polow's testimony cast doubt upon her actual familiarity with the standard of care applicable in Lincoln County, Tennessee in 1997.

We also find significant the following exchange concerning Dr. Polow's discovery deposition testimony regarding her understanding of the standard of care:

Q. Now, then, also, in that April deposition that – in response to a question from Mr. Burns [attorney for Nurse Shutt], in which he asked you how do you define standard of care, you gave the following definition of standard of care, and I'm going to quote it, from page 67 of your deposition. **Your definition of standard of care there was: ["]The standard of which the majority of practitioners for a given area would use in diagnosis and treatment of various diseases and symptoms.["]**

.   .   .

Q. Is that definition your understanding as to what standard of care means, as far as your testimony is concerned in this case?
A. Yes.
Q. Okay. And that's the definition of standard of care that you used to base the opinions you have given regarding the standard of care in this case, right?
A. Yes.

(Emphasis added). Our courts have previously held that the general practice of a majority of physicians in a given area does not constitute the standard of care. *Godbee v. Dimick*, 213 S.W.3d 865, 896 (Tenn. Ct. App. 2006). Rather, "'[t]he standard of care is determined by whether a physician exercises the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession.'" *Id.* (quoting *Hopper v. Tabor*, No. 03A01-9801-CV-00049, 1998 WL 498211, *3 (Tenn. Ct. App. Aug. 19, 1998). Dr. Polow's testimony concerning her understanding of the standard of care calls into question the reliability of her testimony regarding the applicable standard of care.

We acknowledge that the admissibility of Dr. Polow's testimony is a close question. The plaintiffs had the burden of proof to establish the elements under Tenn. Code Ann. § 29-26-115(a). Given the issues discussed above, we cannot find that the trial court abused its discretion in excluding Dr. Polow's testimony. In light of this conclusion, we need not address the sufficiency of Dr. Polow's testimony on the issue of causation.

Testimony of Gregory P. Stevens, P.A.

The other expert identified by the plaintiffs was Gregory Stevens, a physician's assistant. In excluding Mr. Stevens' testimony, the trial court stated:

The problem with his proof, in my mind, is that he just has not demonstrated any knowledge of what a Tennessee nurse practitioner should be doing under these circumstances. I do not see how he could address the issue of breach of the standard of care if he really doesn't know what the parameters are within which nurse practitioners work. He's not familiar with the medications that were given. His testimony on issues like causation, I would say in the least, are not particularly helpful to the plaintiffs.

The court was asked to disqualify Mr. Stevens as an expert witness based upon his deposition testimony. Thus, unlike with Dr. Polow, the plaintiffs would have had the opportunity to cure some deficiencies in Mr. Stevens' deposition testimony at the hearing–for example, the failure to establish a similarity between his community of practice and Lincoln County, Tennessee. We have found, however, that Mr. Stevens' testimony failed to show he was competent to testify as to the standard of care for nurse practitioners.

We start by noting that, without the testimony of Dr. Polow, the plaintiffs likely could not have proven causation. This court has previously held that "[a] nurse is not an expert who can testify as to medical causation." *Hinson v. Claiborne & Hughes Health Ctr.*, No. M2006-02306-COA-R3-CV, 2008 WL 544662, *5 (Tenn. Ct. App. Feb. 26, 2008) (no Tenn. R. App. P. application filed). Tenn. Code Ann. § 29-26-115(b) requires testimony from a licensed health care professional who has practiced in a profession or speciality "which would make the person's expert testimony relevant to the issues in the case." As discussed in *Richberger v. West Clinic, P.C.*, a nurse is prohibited by Tenn. Code Ann. § 63-7-103(b) from making a medical diagnosis and, therefore, he or she lacks the expertise to testify as to causation. *Richenberger*, 152 S.W.3d 505, 511 (Tenn. Ct. App. 2004) Since a physician's assistant may only render diagnostic or therapeutic services under the "supervision, control and responsibility of a licensed physician," there is considerable doubt that a physician's assistant would be competent to testify as to causation. Tenn. Code Ann. § 63-6-204(b).

Even apart from the lack of evidence of causation, however, we find no abuse of discretion in the trial court's decision to exclude Mr. Stevens' testimony. As discussed above, Tenn. Code Ann. § 29-26-115(a) requires that the expert be familiar with "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community." Tenn. Code Ann. § 29-26-115(b) requires that the expert be licensed to practice "a profession or specialty which would make the person's expert testimony relevant to the issues in the case." Mr. Stevens testified that he had been a physician assistant in the emergency department of Hutcheson Medical Center since 1995. He had also moonlighted at Erlanger in the emergency room and urgent care facility, but his urgent care experience occurred after 1997.[2] Mr. Stevens acknowledged that he was not familiar with the medications prescribed by Nurse Schutt for Mr. Bates and that he could not offer any criticism of her choice of medications: "It's hard for me to make any type of criticism with my limited knowledge of starting people on those medications." Mr. Stevens went on to state that, during his career, he had probably started a patient on anti-hypertensive medications about five times.

Mr. Stevens also testified as to his lack of knowledge concerning the acceptable practices of a nurse practitioner, particularly in Tennessee:

Q. What is your understanding of what a nurse practitioner in the state of Tennessee can do in terms of scope of permissible practice?
A. I couldn't say.

---

[2]Mr. Stevens estimated that his urgent care experience represented only about 3% of his time, whereas emergency care accounted for the other 97%.

Q. Okay. Have you done any research to look into that as part of your workup in this case or not?
A. No, I have not.

.   .   .

Q. So you work with nurse practitioners at the urgent care clinic?
A. I don't really work with them. They work there.

.   .   .

Q. And do you know if the nurse practitioner at the urgent care clinic, are they limited in any way as to what their practice parameter is, or do you know?
A. I do not know.
Q. Okay. And the same question with respect to the nurse practitioner that worked in the ER at Erlanger, do you know what the limitations on them are?
A. I can't imagine that there would be much in the way of limitations to be able to practice there.
Q. Do you know what prescriptive privileges nurse practitioners in Tennessee are allowed to have?
A. As far as it pertains to the schedule of narcotic and their ability to write that, I don't know. I think that their scope is much broader and they have the ability to do that. I don't know what it is in particular. I know that it's very limited in the state of Georgia. I don't know that they even have that privilege.

.   .   .

Q. And what is your understanding of how [Nurse Schutt] is supposed to operate with respect to that requirements of this protocol; can you say or not?
A. I can't say. I don't know if she can deviate from the protocol. I don't know how strict the protocol is as to her scope of practice.
Q. How much judgment she can use?
A. Exactly.
Q. To get outside or to stay in?
A. That's correct.
Q. You just can't address that today?
A. I cannot address that. **All I can say is what I believe I would have done.**
Q. Okay. But you function as a PA, we know that?
A. Yes, that's correct.
Q. You don't practice as a nurse practitioner?
A. That is correct.
Q. And it sounds like you're saying that you understand that nurse practitioners practice with these specific parameters that are set forth, correct?
A. Correct.
Q. And as to how much deviation or room they have to operate within, you just can't address that?

9

A. No, I cannot.

Q. Because you're just not familiar enough with what a nurse practitioner does?

A. In this setting.

(Emphasis added). Based upon this testimony, it does not appear that Mr. Stevens was sufficiently familiar with the standard of care for a nurse practitioner to provide relevant testimony. *See Eckler v. Allen*, 231 S.W.3d 379, 387 (Tenn. Ct. App. 2006) (stating that the expert need not practice in the same specialized field but must be sufficiently familiar with the standard of care in the specialty to give relevant testimony). Moreover, the testimony of a medical expert as to what he or she would have done does not establish the standard of care. *Jennings v. Case*, 10 S.W.3d 625, 632 (Tenn. Ct. App. 1999); *Roddy v. Volunteer Med. Clinic, Inc.*, 926 S.W.2d 572, 578 (Tenn. Ct. App. 1996).

We thus conclude that the trial court did not abuse its discretion in excluding the testimony of Dr. Polow and Mr. Stevens. The judgment of the trial court is affirmed. Costs of appeal are assessed against the appellants, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE