IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 17, 2004 Session

## HELAINE RICHBERGER v. THE WEST CLINIC, P.C., ET AL.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. 81970 T.D.     The Honorable John R McCarroll, Jr., Judge**

_____

### No. W2003-00141-COA-R3-CV - Filed April 6, 2004

_____

Plaintiff filed medical malpractice action against clinic, treating nurse, and supervising physician for injuries suffered as a result of alleged negligent chemotherapy treatment. Trial court granted summary judgment in favor of defendants, finding that registered nurse was not qualified as an expert on the issue of medical causation, and further noting that the deposition testimony of lone expert physician failed to establish that the plaintiff's injuries were caused by the negligence of the defendants. Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

Al H. Thomas and Regina Guy of Memphis, For Appellant, Helaine Richberger

David M. Cook and Gregory A. Ziskind of Memphis, For Appellees, The West Clinic, P.C. and Sandy Miller, R.N.

### OPINION

Marshall Richberger was diagnosed with colon cancer in 1991 and died on May 10, 1997, as a result of a protracted struggle with this disease. Helaine Richberger, his natural daughter and next of kin, was substituted as party-plaintiff in this cause on January 9, 1998. In the interest of clarity, we will refer to Marshall Richberger as "Mr. Richberger" or the "deceased." All references to "plaintiff" with respect to pleadings filed after May 10, 1997 should be regarded as references to Helaine Richberger.

Mr. Richberger first presented to The West Clinic, P.C. ("West Clinic"), for chemotherapy treatment in July 1991, after an unsuccessful operation to remove a cancerous tumor from his colon. Dr. Kurt W. Tauer ("Dr. Tauer") acted as the deceased's treating physician during the post-operative

period, and continued his care for Mr. Richberger until his death in 1997. During the initial six-month post-operative period, Mr. Richberger underwent "systemic chemotherapy treatment" with the drugs 5-FU and Leucovorin. According to Dr. Tauer's deposition testimony, both drugs were administered intravenously through the right hand. Upon completion of his treatment in December 1991, Mr. Richberger was declared to be in remission.

Mr. Richberger suffered a recurrence of his cancer in December 1994, and began renewed chemotherapy treatments shortly thereafter. Mr. Richberger was again treated with 5-FU and Leucovorin, but on a different schedule than his first round of administration. Dr. Tauer testified that treatment was discontinued in June 1995 as a result of Mr. Richberger's favorable response and improved condition.

In October 1995, Mr. Richberger learned that his cancer had markedly progressed and required further treatment. On October 25, 1995, he presented to the West Clinic for chemotherapy treatment involving the drug Mitomycin.[1] Sandy Miller, R.N. ("Ms. Miller"), the treating nurse, testified in her deposition that she obtained Mr. Richberger's informed consent prior to administration, explaining to him the potential risks of treatment, including extravasation.[2] Ms. Miller averred that she further advised him to warn her if he felt any burning or sensation of pain during the procedure.

Ms. Miller testified that she began treatment with the insertion of a saline I.V. into Mr. Richberger's right arm, approximately one-half inch above his wrist bone.[3] The I.V. provided a continuous flow of normal saline during the procedure. Ms. Miller next administered a dose of Decadron for nausea, and began a slow push of the Mitomycin through a needle inserted into the vein near Mr. Richberger's wrist. During administration of the Mitomycin, Ms. Miller monitored Mr. Richberger's blood return every minute for 10-15 minutes, and recorded that he had "excellent blood return." Ms. Miller testified that Mr. Richberger never complained of any "pain" during her administration of the Mitomycin, but acknowledged that she stopped the procedure briefly when he complained of aching in his right arm. Ms. Miller testified that the deceased's reaction to the treatment was normal, and noted that she was able to alleviate his discomfort with the application

---

[1] Mitomycin is a vesicant - an antibiotic or drug used in the treatment of cancer that is known to cause blisters or blistering. Ms. Miller testified that Mitomycin was the only vesicant administered to the deceased to her knowledge.

[2] Extravasation is the discharge or escape of blood or another substance such as an injected chemotherapy agent, from the vein into the surrounding tissue. Extravasation of Mitomycin during injection is known to result in "necrosis and consequent sloughing of tissue."

[3] Plaintiff notes that Mr. Richberger testified in his deposition that he remembered the injection site as the dorsum of his right hand. Mr. Richberger's deposition was not included as part of the record on appeal.

of a hot pack and thereafter resume treatment. Ms. Miller further noted that she saw no evidence of swelling or redness at the insertion site.

Once she had administered the full dose of Mitomycin, Ms. Miller waited for the saline to thoroughly flush Mr. Richberger's veins before stopping the I.V. flow. Ms. Miller next administered the drug Leucovorin via slow push, and followed with a slow push of the drug 5-FU. It is evident from the testimony in the record that Ms. Miller documented the medications administered to the deceased; however, the order in which these drugs were administered was not specified.[4]

On October 30, 1995, Mr. Richberger returned to the West Clinic complaining of pain and blistering in his right hand. Both Dr. Tauer and Ms. Miller confirmed that the blistering was distal to the I.V. site, an uncommon occurrence according to Dr. Tauer, who testified that normally damage is seen at the site of the injection. Dr. Tauer concluded that it was clear that Mr. Richberger suffered an extravasation of Mitomycin during the October 25, 1995 procedure, noting that the burning sensation was a serious indicator of extravasation.

In an attempt to "control and clean up" the tissue damaged by the Mitomycin extravasation, Mr. Richberger underwent daily whirlpool and physical therapy treatment. On November 3, 1995, he called the West Clinic and voiced renewed complaints of pain. Ms. Miller testified that she instructed Mr. Richberger to apply Neosporin to the wound and ordered Lortab for his pain. That same month, Mr. Richberger was referred to Dr. Robin Stevenson, a plastic surgeon, for additional treatment and consultation. Mr. Richberger's complaint describes his condition, treatment and operation history after November 1995:

> On examination by Dr. Stevenson, Plaintiff was found to have a partial to full thickness injury to the dorsum of the hand extending into the second web space and proximately to the proximal hand. Dr. Stevenson also found Plaintiff had lost some motion of the MP joints.
>
> Dr. Stevenson referred Plaintiff Richberger to Baptist Hospital physical therapy department for daily dressing changes, debridement, and range of motion to the MP joints.
>
> In January 1996, Plaintiff Richberger was admitted to Baptist Hospital due to full thickness skin loss, infection, and blistering of his [right] hand. Plaintiff received Hyperbaric oxygen treatment but later had to be taken to surgery where he underwent a posterior

---

[4] Plaintiff notes that Mr. Richberger testified in his deposition that he remembered Ms. Miller administering Mitomycin last in the sequence of drugs identified. The facts, as recounted by this Court, represent Ms. Miller's recollection as to the sequence of administration. We reiterate that Mr. Richberger's deposition was not included in the record on appeal.

interossesous rotational skin flap to cover the dorsum of his [right] hand.

Because of the extravasation injury to Plaintiff's hand from the chemotherapy agent, Plaintiff's chemotherapy treatments were discontinued so that his right hand would heal; however, because of plaintiff's cancerous condition the chemotherapy had to be resumed.

Plaintiff Richberger continued to experience necrosis and infection to his [right] hand and had to undergo amputation of his index finger in May 1996.

On October 2, 1996, Mr. Richberger filed a complaint for medical malpractice against Dr. Tauer, West Clinic, and Ms. Miller, alleging negligence by defendants in the October 25, 1995 chemotherapy treatment. The complaint includes the following allegations of negligence and resulting damages:

Defendant Miller, employee of Defendant West Clinic and/or Defendant Tauer, negligently continued to infuse [Mitomycin] despite plaintiff Richberger's complaint of pain and burning, causing plaintiff serious and permanent injuries.

Defendant Miller was negligent in failing to report Plaintiff Richberger's complaints of pain and burning to Defendant Tauer causing Plaintiff to suffer serious and permanent injuries.

Defendant Miller failed to provide proper nursing care to Plaintiff Richberger causing him to suffer serious and permanent injuries.

Defendants West Clinic and Tauer failed to provide and are liable under the doctrines of Respondeat Superior and under the doctrine of Apparent Agency for the failure of the defendant Miller, to provide adequate and appropriate medical care during chemotherapy treatment to plaintiff Richberger, as well as other acts and omissions which breach the standard of care.

### DAMAGES

Plaintiff alleges that as a direct and proximate result of the negligence and medical malpractice by the Defendants, Plaintiff Marshall Richberger suffered substantial damages as follows:

-4-

> a. caused to suffer and incur severe and permanent physical damages to his body resulting in extreme ***pain and suffering***, that he required medical treatment to treat his injuries, thereby incurring substantial ***medical expenses*** as well;
>
> b. caused to suffer substantial ***loss of wages and/or the loss of the capacity to earn his normal wages***;
>
> c. caused to endure severe ***emotional distress and mental anguish***.

(emphasis in original).

Defendants filed a joint answer on November 19, 1996, denying all allegations of negligence and asserting as an affirmative defense that Mr. Richberger's treatment on October 25, 1995 "was in entire conformity with the recognized standard of acceptable professional practice for their specialties in this community, and that the plaintiffs have sustained no injury as the result of any treatment provided by [defendants]." As noted, Mr. Richberger died in May 1997, and his daughter was substituted as party-plaintiff.

On February 25, 1998, Dr. Tauer filed a motion to dismiss or for summary judgment supported by his deposition. That same day, West Clinic and Ms. Miller filed a joint motion to dismiss for summary judgment supported by the deposition of Sandy Miller. In opposition to the defendants' motion, plaintiff relied on the affidavit and deposition of Yvonne Yetman, R.N.("Ms. Yetman"), and the deposition of Dr. Tauer.

On June 23, 1999, plaintiff filed an order voluntarily dismissing Dr. Tauer as a party-defendant to the action. On December 9, 2002, a hearing was held on the motion of West Clinic and Ms. Miller. The trial court granted defendants' motion by order filed December 23, 2002, stating:

> Having considered the parties written submissions, the deposition of Kurt W. Tauer, M.D., argument in open court and the entire record in this cause, the court is of the considered opinion that the defendants' motion is well taken and should be granted. According to T.C.A. § 63-7-103(b), a registered nurse is prohibited from making a medical diagnosis and is therefor not competent to offer opinions on medical causation in a medical malpractice action. The court has considered and relies upon the Court of Appeals decisions in the cases of ***Nash v. Goodlark Hospital***, 1990 WL 56192 (Tenn. Ct. App. May 4, 1990), and ***Bishop v. Smith Nephew Richards, Inc.***, No. 02A01-9405-CV-00108, 1995 WL 99222 (Tenn. Ct. App. Mar. 10, 1995). The discovery deposition of Dr. Tauer is likewise insufficient to satisfy the plaintiff's burden. The medical

-5-

malpractice statute requires that the plaintiff prove that the defendants failed to act in accordance with the recognized standard of acceptable professional practice and that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise occurred. T.C.A. § 29-26-115. Dr. Tauer's testimony does not establish that the decedent's injuries were caused by the negligence of the defendant, Ms. Miller. Incorporated by reference is the transcript of proceedings in this cause of December 10, 2002.

Plaintiff filed a timely notice of appeal on January 13, 2003, and presents to this Court the following issues for review: (1) Whether a registered nurse is permitted to testify as an expert witness in a medical malpractice action as to the issue of causation; and (2) Whether the remaining evidence in the record was sufficient to create a genuine issue of material fact as to medical causation pursuant to T.C.A. § 29-26-115(a)(3).

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id*. In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id*. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

**I.**

The first issue presented for review is whether the trial court erred in ruling that a registered nurse is prohibited from testifying as an expert witness as to the issue of causation in a medical malpractice action for the purpose of satisfying T.C.A. § 29-26-115(a)(3). The court's ruling was based on its conclusion that a "registered nurse is prohibited from making a medical diagnosis [pursuant to T.C.A. § 63-7-103(b),] and is therefore not competent to offer opinions on medical causation in a medical malpractice action."

In Tennessee, medical malpractice actions are governed by the provisions of T.C.A. § 29-26-115 (Supp. 2003), which provides in pertinent part:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
>
> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

In the instant matter, we are particularly concerned with subsection (b), and whether a registered nurse is competent, as envisioned under the statute, to testify as an expert in a medical malpractice action for the purpose of satisfying T.C.A. § 29-26-115(a)(3). From our review of the authority in

this jurisdiction, we find that the trial court did not err in ruling that Ms. Yetman was prohibited from testifying as an expert regarding the issue of causation.

In *Nash v. Goodlark Hospital*, 1990 WL 56192 (Tenn. Ct. App. May 4, 1990), the Tennessee Court of Appeals, Middle Section, considered whether the trial court erred in granting summary judgment in favor of the defendant hospital and nurse in a medical malpractice action. The court specifically examined the causation testimony of defendants' expert physician witness, Dr. E.Wiser, and the countervailing standard of care and causation testimony of Ms. Melanie Joy, a Registered Nurse. Upon consideration of the conflicting causation testimony, the court noted:

> Dr. Wiser testified, as we have noted, that the airway of the decedent was clear and unobstructed, that he did not suffocate, and that he died naturally as a result of the advanced and incurable nature of his disease.
>
> The counter-affidavit of Nurse Joy is insufficient to overcome Dr. Wiser's testimony. While the appellee takes it to task because Nurse Joy states that she bases "this affidavit upon my training, education and experience as well as the facts of this case which have been told to me" and "from reading the documents in this case," we think it clear that the failure of the appellant to countervail the positive testimony of the appellee's expert respecting causation is fatal to her insistence that a genuine issue of a material fact, Rule 56, Tenn. R. Civ. P., exists for determination by a jury. *Even if by a generous extrapolation of Nurse Joy's affidavit we concluded that she reached the issue of causation, the fact remains that she is prohibited from making a medical diagnosis, T.C.A. 63-7-103(b)*. Consequently, it is uncontradicted in this record that the decedent did not die of strangulation or suffocation; and it is not rebutted that his death was the result of incurable disease.
>
> Summary judgment was therefore proper. *See Bowman v. Henard*, 547 S.W.2d 527 (Tenn. 1977).

*Id*. at *2 (emphasis added).

In *Bishop v. Smith Nephew Richards, Inc.*, No. 02A01-9405-CV-00108, 1995 WL 99222 (Tenn. Ct. App. Mar. 10, 1995), this Court considered, *inter alia*, the issue of whether the trial court erred in granting summary judgment to defendant. *Id*. at *2. Plaintiff's complaint alleged, in part, that defendant Karen Calabretta, an occupational health nurse, was negligent in her care of plaintiff for complications from a previously sustained head injury, and that said treatment was the direct and proximate cause of plaintiff's injuries and damages. *Id*. In support of her Motion for Summary Judgment, the defendant relied primarily upon the affidavit of Dr. Alan Boyd, "which state[d] in

substance that there was no medical treatment that could have been provided after [the date of the accident] that would have prevented [the later arising injury.]" *Id*. at \*3. Plaintiff filed the affidavits of Dr. William G. Jennings and three nurses in opposition to defendant's motion. *Id*. at \*4-5. Upon examination of the testimony in the record, we concluded:

> Dr. Jennings clearly opined that the hematoma discovered December 17, 1990, proximately resulted from the trauma of November 12, 1990, but he does not state that more probably than not Bishop had better than an even chance of recovering from this hematoma absent Calabretta's negligence. The sum total of his affidavit concerning causation as it relates to Calabretta is that there is a possibility the damage could have been avoided. This is not sufficient to show causation. *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992). ***Plaintiffs also rely upon the affidavits of three nurses, which, in addition to stating the standard of care and deviation therefrom, give opinions regarding causation essentially the same as Dr. Jennings. In addition to being outside the expertise of the nurses, see T.C.A. § 63-7-103(b) (1990); [Nash v. Goodlark Hospital, 1990 WL 56192 (Tenn. Ct. App. May 4, 1990)], these opinions regarding causation are speculative in the same manner and for the same reasons set out for Dr. Jennings.*** Accordingly, the trial court correctly granted summary judgment to defendant Calabretta.

*Id*. at \*5 (emphasis added).

Based upon the foregoing authority, we find that the trial court did not err in concluding that Ms. Yetman was prohibited from testifying as an expert witness with regard to the issue of causation.

## II.

Plaintiff next asserts that even if Ms. Yetmen's discovery deposition testimony is not considered for the purpose of satisfying plaintiff's burden to prove causation under T.C.A. § 29-26-115(a)(3), the deposition testimony of Dr. Tauer is sufficient to create a genuine issue of material fact with regard to causation.

When questioned regarding his expert medical opinion as to the cause of Mr. Richberger's injury, Dr. Tauer testified unequivocally that the injuries suffered were caused by an extravasation of Mitomycin into the deceased's tissue, stating:

> Q. Do you have an opinion, Doctor, based upon a reasonable degree of medical certainty as to what caused Marshall Richberger this injury that he sustained?

A. Oh, I know exactly what caused it.

Q. Tell us, please.

A. In spite of our routine procedure of care, he was given a drug that has a terrible side effect of causing tremendous tissue injury if any of it gets outside of the vein; and he had an extravasation by the drug which caused him tremendous injury to his hand.

Q. And in your opinion even if Sandy Miller had given it in the dorsum of the hand, you do not think it would have been a deviation from the standard of care?

A. If he had a good flowing running I.V., it would not have been her first choice, but it would not have been a deviation of care.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. That wasn't my question. My question is do you have any opinion in retrospect as to how the administration of Mitomycin to Marshall Richberger could have been given without causing this injury that he sustained?

A. Are there other things that we could have done that would have been outside of our usual operating procedure to make sure that this was not done, yes.

Q. What would they have been?

A. The central line and the porta cath that you talked about would be ways to prevent this kind of injury from happening; but as I stated earlier when you asked that question, when a patient gets Mitomycin for the first time and they have good I.V. blood return, we don't normally do that.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. So I gather it's your contention that this type of injury that Marshall Richberger sustained can occur absent negligence?

A. Yes.

Q. And is it true that every time it [has] happened out here at West Clinic it's always been absence of negligence?

A. Well, first of all, let me suggest that it doesn't happen out here very much at West Clinic; but every time it does happen, it's not because of negligence, it's just because of bad luck.

As noted, Dr. Tauer's deposition testimony clearly identifies the extravasation of Mitomycin into the surrounding tissue as the cause of Mr. Richberger's injury. Moreover, Dr. Tauer's testimony further evidences an opinion that the extravasation, in this case, did not occur as a result of any negligent conduct on Ms. Miller's behalf. We note that there is no other qualified expert testimony in the record pertaining to or addressing the issue of causation.

Thus, as the record stands, we have only the expert medical testimony of Dr. Tauer that Mr. Richberger's injury was caused by the extravasation of Mitomycin into the surrounding tissue, and his further insistence that the extravasation was not the product of any negligent care or conduct. Although Ms. Yetmen maintains that Ms. Miller deviated from the applicable standard of care in her treatment of the deceased on October 25, 1995, she concedes that the extravasation of a vesicant can occur absent negligence. The record is devoid of any expert testimony directly connecting Ms. Miller's alleged negligent conduct and care to the deceased's injury.

Accordingly, we affirm the trial court's Order of December 23, 2002 granting defendants The West Clinic, P.C., and Sandy Miller, R.N., summary judgment. Costs of this appeal are assessed against the plaintiff, Helaine Richberger, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.