**IN THE COURT OF APPEALS OF TENNESSEE**
**AT NASHVILLE**

**October 16, 2008 Session**

**Sherrill Johnson, Individually and as next friend of Victoria Johnson v. Metropolitan Government of Nashville and Davidson County**

**Appeal from the Circuit Court for Davidson County, No. 07C536**
**Barbara Haynes, Judge**

---

**M2008-00551-COA-R3-CV - Filed December 12, 2008**

---

A bystander in a parking lot was injured by a ricocheting bullet fired by a police officer. The officer and a fellow officer had been confronted in the parking lot by an armed assailant who fired his handgun at or towards the officers. The bystander, contending that one of the officers was negligent when he fired his weapon in self-defense, sued the Metropolitan Government of Nashville and Davidson County under the Tennessee Governmental Tort Liability Act. The trial judge dismissed the case on summary judgment. We find that the police officer acted reasonably under the circumstances confronting him, and we therefore affirm the trial judge.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

WALTER C. KURTZ, SR.J., delivered the opinion of the Court, in which ANDY BENNETT, J., and RICHARD DINKINS, J., joined.

Henry S. Queener, Nashville, for the Appellants.

Sue Cain, Lora Barkenbus Fox, and Jeff Campbell for the Appellee.

## OPINION

I

This is a case brought under the Tennessee Governmental Tort Liability Act (Tenn. Code Ann. § 29-20-101 *et seq.*) alleging that police officers negligently fired their handguns during a hostile encounter in a parking lot that resulted in a bullet ricocheting off a step and wounding a bystander (the minor appellant). The trial court dismissed the action on a motion for summary judgment. For the reasons stated herein, we affirm that decision of the court below.

II.

This Court's standard for reviewing a trial court's granting of a motion for summary judgment pursuant to Tenn. R. Civ. P. 56 has been stated often. "The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law." *Ferguson v. Nationwide Prop. & Cas. Ins. Co.*, 218 S.W.3d 42, 48 (Tenn. Ct. App. 2006) (citations omitted). "In determining whether or not a genuine issue of material fact exists for purposes of summary judgment. . . the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993) (citations omitted).

"When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (*citing Byrd,* 847 S.W.2d at 215). "If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." *Cantrell v. Dekalb County,* 78 S.W.3d 902, 905 (Tenn. Ct. App. 2001) (citations omitted).

"Summary judgment is not a disfavored procedural device and may be used to conclude any civil case, including negligence cases, that can be and should be resolved on legal issues alone[.]" *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997). It is not, however, a substitute for "the trial of issues of fact." *Id.* "Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." *Richberger v. West Clinic, P.C.*, 152 S.W.3d 505, 510 (Tenn. Ct. App. 2004) (citations omitted). We review a trial court's award of summary judgment *de novo* without attaching any presumption of correctness to the decision below, "and the task of the appellate court is confined to reviewing the record to determine whether the requirements for summary judgment have been met." *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 217 (Tenn. Ct. App. 1997) (*citing Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995)); *See Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991).

III.

The appellant states the issues as follows:

1. Whether genuine issues of material fact exist in this case which made the universally-accepted rule of firearm safety - "know your target and what is beyond it"- a duty the defendant [appellee] owed to the plaintiff [appellant]; and

2. Whether the plaintiff [appellant] presented a prima facie case that the defendant breached said duty in shooting the plaintiff [appellant].

On the other hand, the Metropolitan Government contends that the decision below was correct as:

1. Given the totality of the circumstances the officers actions were objectively reasonable; and

2. The actions of the officers were not the proximate cause of appellant's injury.

IV.

The order entered by the trial court contains the following overview of the undisputed facts:

> On the evening of February 25, 2006, [appellant] Victoria Johnson[1] attended a party at the invitation of her cousin Courtney Glenn. The party was held at the Valley Brook Apartments on Zermatt Avenue in South Nashville.
>
> After arriving at the party, [appellant] saw an individual with a gun. Other individuals showed up and identified themselves as gang members. According to the [appellant], the two groups began making signs with their hands and "spitting words" at each other. Because it appeared an altercation was brewing, [appellant] was scared. She suspected the conflict was gang-related.
>
> [Appellant] left the apartment only when, as a result of the conflict, the party's host asked everyone to leave. After the guests were asked to leave, [appellant] went upstairs to get her coat and then walked outside.
>
> [Appellant] was outside the apartment looking for her cousin when she heard a gunshot. [Appellant] began running up a hill to the side of the building then turned back and attempted to hide behind a car. [Appellant] heard a second gunshot and fell to the ground, having been struck in the leg by a bullet.[2]
>
> On February 25, 2006, Detectives Matthew Chance and Dwayne Greene were riding together in an unmarked car in the vicinity of the Valley Brook apartment complex on Zermatt Avenue in South Nashville. Detective Chance and Detective

---

[1] Ms. Johnson, appellant, was age 13 at the time of the incident.

[2] One other bystander was slightly wounded.

Greene were assigned to the Specialized Investigation Division Gang Unit. The detectives' assignment was two-fold: to investigate gang activity and to attempt to make undercover drug purchases.

The detectives attempted unsuccessfully to make a drug purchase and turned around in a cul-de-sac. At that point, the detectives saw people pouring out of the apartment where the party was occurring. The detectives had previously received information that there were rumors of a party at the complex where gang members were going to be present.

Detective Greene, who was driving the car, then pulled into a parking space in front of the apartment building. The spaces to either side of the detectives' car were empty.

It appeared to Detectives Chance and Greene that two groups of individuals were about to fight. Three or four of these individuals were dressed in red and at least one was wearing a red bandana. Suspecting an altercation might occur, Detective Chance communicated this to other members of his unit via his radio.

Detective Greene then observed one of the subjects wearing red draw a handgun. He exclaimed to Detective Chance that one of the subjects had a gun. Detective Chance then looked around, attempting to identify who had the weapon.

Detective Chance observed four individuals, dressed in black, about five feet behind the detectives' car. Detective Chance also observed three or four individuals, dressed in red, walking up the sidewalk in front of the detectives' car. One of the individuals walking up the sidewalk was holding a gun, arm extended, pointing it in the direction of both detectives and the individuals behind the detectives' car.

Detectives Chance and Greene exited the car and identified themselves as police officers, with Detective Chance stating, "Police, police, drop the gun."[3]

---

[3] Appellant, in her appellate brief, makes this somewhat incredible observation: "Officer Chance jumping out of an unmarked police [car] caused the surprised aggressor to accidentally fire his gun. Officer Chance created the gunfire, to which he then responded."

> The subject then fired his weapon. Detectives Chance and Greene each fired one shot from their police-issue .40 caliber Glocks in return. The shooter and his companions turned and fled. Neither detective fired another shot.
>
> Detective Greene pursued and apprehended two of the subjects behind one of the apartment buildings in the complex. Each subject was in possession of a handgun. One was a Rossi .357 magnum revolver fully loaded with one round spent; the other was a Keltec 9mm semiautomatic with one round in the chamber and three in the magazine.
>
> During the exchange of gunfire, [appellant] was struck in the leg by a .40 caliber bullet. The scene was processed, diagramed and photographed. One .40 caliber bullet was recovered from an air conditioning unit in front of the apartment building. Based on the post-incident investigation, it was determined that [appellant] was most likely struck in the leg by a .40 caliber bullet fired by Detective Greene which ricocheted off a step of the apartment building.[4]

In opposing the motion, appellant offered the affidavit and report of an expert witness. The expert, Mike Wright, stated the following in relation to the statements of the two detectives:

> Detective Chance's statement differs from Detective Greene's in that he only recounts three shots fired and everyone started running when he fired his one shot. Detective Greene states that he heard five shots and the suspects are still advancing toward him two shots after Detective Chance has fired. Detective Chance admitted he did not realize Detective Greene had fired a shot until after he returned to the shooting area later. The question then would be why would the suspects continue moving towards an officer yelling "police, police" and shooting at them until Detective Greene's shot - 4 steps and two shots later? In Detective Chance's account, the suspects would have been fleeing away from the officers in the direction of the crowd, still not approaching the officer's position when Detective Greene fired. The timeline of Detective Greene's statement cannot be reconciled with the statement of Detective Chance.

---

[4] Photographs in evidence show that the appellant was about 15 feet away from the steps when hit.

> Another possibility is that the unnamed suspect who admitted firing one shot was the first shot fired and Detective Greene's was the second shot. This would verify Ms. Johnson's statement when she said she was struck by the second shot. That would make Detective Chance's shot the third shot fired. Detective Chance admitted he saw no flash from the suspect, only heard his two shots. This scenario will be revisited later in the report.
>
> The police department did not deny that their [detectives] fired two shots, one shot each. The police interviewed an unnamed person who was possibly the alleged gang shooter of Detectives Greene and Chance's statements. This undisclosed person stated that he fired one shot. He further stated that he fired a .38 caliber revolver aimed at the ground. If Detective Chance heard the first shot into the ground there would be no muzzle flash, and if Detective Green fired the second there would also be the sound and no muzzle flash. There is some incongruity in the number of shots fired in all of the statements.

Mr. Wright concluded that Detective Greene was negligent in firing his handgun without being sure who might be standing behind the armed suspect.[5] Appellant's counsel asserts that it was negligence when the officers violated a universally accepted principle - that before you fire you must not only know your target but also what is beyond it.

Detective Greene, in turn, explained his actions as follows:

> Uh, I didn't really have a, didn't even have a choice when he was turning my, turning facing me, but I didn't really have a good backdrop. Uh, I just remember seeing him turn around, facing me with the gun, and I fired one shot. It happened so fast I don't even know if I even had a chance to think about a backdrop, but what was there, there was nothing there at the time, cause people were scattering everywhere.

On appeal, both parties have made reference to the police policy governing the use of force. The applicable provisions are:

XIV. <u>USE OF DEADLY FORCE IN SELF DEFENSE</u>

Authorized employees may use deadly force when they have a reasonable belief that the action is immediately necessary to prevent imminent death or serious bodily injury of a human being, including the employee.

---

[5] The Court has carefully read Mr. Wright's entire 15-page report.

XV. USE OF DEADLY FORCE TO EFFECT AN ARREST

Authorized employees may use deadly force to effect the arrest of a fleeing felon only when:

A. The employee has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; AND

B. The employee has probable cause to believe that the individual to be arrested poses a threat of death or serious bodily injury, either to the employee or to others unless immediately apprehended; AND

C. Where feasible, the employee has identified himself/herself as a police employee and given warning such as, "STOP– POLICE–I'LL SHOOT," that deadly force is about to be used unless flight ceases; AND

D. If all other means of apprehension available to the employee under the attendant circumstances have been exhausted.

XVII. GENERAL PROVISIONS

A. . . . .

B. Authorized employees shall adhere to the following restrictions:

1. Except for maintenance, official inspections, or during training, employees shall not draw or exhibit their firearm unless circumstances create reason to believe that it may become necessary to use it as provided in this policy;

2. Warning shots are prohibited;

3. When effecting an arrest, no form of deadly force shall be used which would pose a substantial risk to innocent bystander; and

4. When the use of deadly force is necessary to defend the employee or another from death or serious bodily harm, every effort will be made to minimize the risk of harm to innocent persons.

The above policies are simply the implementation of the statutory requirements set forth in state law after the Supreme Court decision in *Tennessee v. Gardner*, 465 U.S. 1098 (1985).

> Use of deadly force by a law enforcement officer:
>
> (a) A law enforcement officer, after giving notice of the officer's identity as such, may use or threaten to use force that is

> reasonably necessary to accomplish the arrest of an individual suspected of a criminal act who resists or flees from the arrest.
>
> (b) Notwithstanding subsection (a), the officer may use deadly force to effect an arrest only if all other means of apprehension have been exhausted or are unavailable, and where feasible, the officer has given notice of the officer's identity as such and given warning that deadly force may be used unless resistance or flight ceases; and
>
> (1) The officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or
>
> (2) The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

Tenn. Code Ann. § 39-11-620.

V.

In considering whether a police officer is negligent in the discharge of a firearm during a legitimate confrontation with an armed person, the Court must consider several factors that may alter application of the normal definition of negligence. In sustaining the granting of a summary judgment in a case involving a police shooting of a fleeing felon, the Federal Court of Appeals for the Sixth Circuit made this salient observation:

> In determining whether [the police officer] acted reasonably, we are guided by *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), in which the Supreme Court gave a more complete explanation of how courts should examine § 1983 claims that invoke *Garner*. The Court emphasized that " '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' however, its proper application requires careful attention to the facts and circumstances of each particular case. . .." [*Graham*] 490 U.S. at 396, 109 S.Ct. at 1871-72 (quoting *Bell v. Wolfish*, 441 U.S.520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)). The Court also held that in applying the test, judges must consider the difficulties of modern police work:
>
>> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . .. The calculus of reasonableness must embody allowance

> for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.
>
> 490 U.S. at 396-97, 109 S.Ct. at 1872. This passage carries great weight in this case, since all parties agree that the events in question happened very quickly. Thus, under *Graham* [*supra*], we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 346-47 (6th Cir. 1992), *cert. denied*, 504 U.S. 915 (1992).[6]

When an officer is suddenly confronted with an armed person with a drawn handgun, he is facing a sudden emergency long held to modify the normal rule of negligence.

The normal definition of negligence is the following:

> Negligence is the failure to use ordinary or reasonable care. It is either doing something that a reasonably careful person would not do, or the failure to do something that a reasonably careful person would do, under the circumstances in this case. The mere happening of an injury or accident does not, in and of itself, prove negligence.

T.P.I 3.05.

But when faced with a sudden emergency, the above is modified:

> A person who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy of judgment as a person acting under normal circumstances who has time to think and reflect before acting. A person faced with a sudden emergency is required to act as a reasonably careful person placed in a similar position. A sudden emergency will not excuse the actions of a person whose own negligence created the emergency._________

T.P.I. 3.08; *See Irvin v. City of Kingsport*, 602 S.W.2d 495, 498 (Tenn. Ct. App. 1980).

---

[6] Whether a police shooting case is brought as a "civil rights" case or a negligence case, both come down to determining if the officer's actions were "reasonable" under the circumstances.

In cases involving accidental shootings of innocent bystanders, the courts have recognized this rule. In *United States v. Jasper*, 222 F.2d 632 (4th Cir. 1955) a policeman fired a shot to subdue a mob, and the bullet ricocheted off the pavement and hit a bystander. The Court held that the officer's conduct performed under the stress of emergency is to be judged with a different standard from that used in weighing acts performed under normal conditions. *Id.* This rule is particularly applicable when an officer, through no fault of his own, is placed in a position which necessitates him acting in the stress of an emergency. *See Dyson v. Schmidt*, 109 N.W.2d 262, 266 (Minn. 1961). Justice Holmes once observed that "detached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 U.S. 335, 343 (1921).

The decision of the United States Supreme Court in *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769 (2007), provides guidance both as to procedure and substance. In *Scott*, the Court had before it the appeal of a summary judgment granted to a police officer in a civil rights case where the officer had seriously injured the respondent when he was apprehended during a high speed chase. *Id.*

The Court first made clear that once all "material" facts were before it, the decision as to whether the officer's actions were "reasonable" was one for the Court and appropriate for summary judgment. *Scott*, 127 S.Ct. at 1776, 1776 n. 8.

The Court next addressed how it must weigh all factors when considering if the officer's actions were reasonable:

> [I]n judging whether Scott's actions were reasonable, we must consider the risk of bodily harm that Scott's actions posed to respondent in light of the threat to the public that Scott was trying to eliminate. Although there is no obvious way to quantify the risks on either side, it is clear from the videotape that respondent posed an actual imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase. . ..
>
> But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best.

*Scott,* 127 S.Ct. at 1778.

In the case now before this Court, there was an additional factor: the weapon fired by the assailant either at or in the direction of the officers. This act certainly made it reasonable for the detectives to conclude that the suspect posed an immediate serious threat to them or the persons standing behind them. *See Scott v. Clay County*, 205 F.3d. 867 (6th Cir. 2001), *cert. denied*, 531 U.S. 874 (2000) (after stopping vehicle, officer acted reasonably in firing his handgun at car

when it was driven directly at him; the bullet hit innocent passenger; but summary judgment was appropriate).

Appellant places reliance on *Sanford v. Metropolitan Gov't. of Nashville & Davidson County*, 1997 WL 24863 (Tenn. Ct. App. Jan. 24, 1997), *permission to appeal granted* Oct. 6, 1997.[7] *Sanford* involved a "shots fired" call to the police. A neighbor reported seeing Mr. Dickerson step out of his front door and fire two to three shots into the ground. Ms. Sanford, a friend of Mr. Dickerson, lived across the street.

Officers McClellan and Stevens arrived, and a neighbor informed Officer McClellan that the man he was looking for was inside his house and had fired a number of shots. Without discussing a plan, the officers approached Mr. Dickerson's front door with their guns drawn. Mr. Dickerson's front door was open, but his storm door was closed. The lights were on in the living room. The officers looked through the storm door into Mr. Dickerson's living room. No one was in the living room, but there was a phone cord stretched from the kitchen to the hallway. The officers heard a voice coming from the hallway which they described as loud and angry. The evidence later revealed that Mr. Dickerson was arguing with someone on the phone.

The officers entered the house without announcing their presence. They later explained that they did not announce their presence because they feared there might be someone inside who was in danger. Mr. Dickerson then exited the bedroom and walked toward the living room with a gun in one hand and the phone in the other. Sergeant Stevens ducked into the kitchen, and Mr. Dickerson passed by without seeing Sergeant Stevens. In the same instant, Officer McClellan went out the front door.

Mrs. Sanford contended that Mr. Dickerson may have been checking for an intruder or simply walking to the front door when he walked through the living room. The officer, however, contended that Mr. Dickerson was chasing him out of the house. After exiting the house Officer McClellan jumped down off the porch and sought cover at the corner of the house. Sergeant Stevens remained in the kitchen.

The government asserted that Mr. Dickerson raised his gun after the storm door closed behind him and that the officers fired simultaneously at that time. Mrs. Sanford claimed that Mr. Dickerson's arms remained at his side as he came through the storm door. She also claimed that Sergeant Stevens began to fire at Mr. Dickerson as he tried to go out the door.

Mr. Dickerson was fatally wounded. Officer McClellan fired nine shots, and Sergeant Stevens fired four shots. A total of nine shots hit Mr. Dickerson. Sergeant Stevens' actions resulted in one wound, and Officer McClellan's actions resulted in eight. One of the bullets shot

---

[7] Permission to appeal was granted, but the case was settled while on appeal. The appeal was then dismissed. The persuasive authority of such a case is not made clear by Tenn. S. Ct. R. 4. The parties have discussed the case as persuasive authority so the Court shall treat it as such.

from Sergeant Stevens' gun traveled across the street, through Mrs. Sanford's storm door, and into her living room where it struck her in the face causing serious injury.

> Police officers are taught that when they approach a house where a suspect is armed, they should take cover and first try to get the suspect outside the house. The reason police officers are taught to issue verbal challenges from positions of cover when confronting armed individuals is to keep the situation from escalating into violence. Another reason is that situations where officers confront armed individuals are not always what they seem. When an officer announces [himself] and orders the subjects to surrender, he is able to buy time in which to better ascertain the suspect's identity and intentions and to avoid the unnecessary use of deadly force.
>
> Here, the improper unannounced entry into Mr. Dickerson's home by police officers endangered the lives of not only the police officers but also of Mr. Dickerson and of innocent citizens in the area. The trial court concluded that the method of entry was "in conformity with a narcotics raid where spoilation of evidence or destruction of evidence is an overriding consideration, as opposed to a shot's fired call." Had the officers utilized proper procedures and stayed outside the home, they may not have felt the need to shoot at Mr. Dickerson.
>
> In addition, Sergeant Stevens breached his duty of care to Mrs. Sanford and other neighbors in the area by firing at Mr. Dickerson's back when he had no idea what was beyond the target. Before violating a cardinal rule of firearm safety, to be sure of your target and what is beyond it, Sergeant Stevens had to have reasonable belief that Officer McClellan's life was in danger. Here, the evidence reveals he did not have such a belief. He had no idea where Officer McClellan was and began shooting at Mr. Dickerson's back before he knew if Mr. Dickerson posed any threat to his partner.
>
> The officers owed a duty of care to Mrs. Sanford and Mr. Dickerson's other neighbors. They breached that duty by escalating a misdemeanor disturbance call into a gun battle. Even though they were clearly operating in a heavily populated residential area, they made no attempt to warn any of the residents of a potential shoot out. They made no attempt to move residents in the possible line of fire to a safe area. They merely went into

> Mr. Dickerson's home without any regard for the possible consequences to innocent residents of that immediate vicinity.

*Sanford*, 1997 WL 24863, at *10-11.

There are significant differences between this case and *Sanford*. First, the detectives in the instant case did not create this dangerous situation: it confronted them. Second, and of critical import, a shot was fired at the detectives or at least the circumstances were such that they had reason to believe that the shot was fired at them.[8]

Here the detectives were required to respond instantaneously to a shot fired in their direction. There was no time for reflections; their lives and the lives of those behind them were in immediate danger of death or serious injury. This was no fleeing felony, but rather an assailant armed with a firearm. The *Sanford* Court recognized that normally an officer should know what is beyond his target *unless* the officer reasonably believes his life is in danger. Here, the detectives had such a reasonable belief, and there was simply no time for reflection.

Appellant argues that there is a factual dispute as to whether the suspect may have turned and started to flee when the one shot was fired by Detective Greene. Appellant further argues that this dispute is sufficient to deny summary judgment because if it was true that the assailant turned to flee, then the officer was no longer in immediate danger.

Even assuming this fact to be true, this Court is convinced that the result is not changed. The immediacy of the situation remains the same. The suspect fired a shot and the detective was instantaneously faced with a life-threatening situation. To repeat: this situation called for "allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force necessary in a particular situation." *Smith v. Freland*, 954 F.2d at 347. This is especially true where a shot had been fired at them. Twenty-twenty hindsight may indicate that the other options were available, but it is foresight that governs the application of the negligence standard in this life-threatening situation.

The Court wishes to emphasize that this decision may well have been different if these detectives had created the dangerous situation by their own conduct or if they had not been immediately confronted by an armed suspect who shot at them or the persons behind them. Under the circumstances that confronted these detectives, they acted reasonably. Summary judgment is appropriate.

VII.

For the reasons stated above, the judgment of the trial court is affirmed. Costs of appeal are assessed against the appellant.

---

[8] The assailant claimed that he had merely fired a round into the ground.

Walter C. Kurtz, Senior Judge